Betty Ann MARSEE, Administratrix of the Estate of Marvin Sean Marsee, Deceased, Plaintiff,

v.

UNITED STATES TOBACCO COMPANY, Defendant.

No. CIV–84–2777–R.

United States District Court, W.D. Oklahoma.

June 25, 1986.

Dania Deschamps-Braly, Braly & Braly, Ada, Okl., Mack Murate Braly, Mack Murate Braly & Associates, Tulsa, Okl., for plaintiff.

Andy Coats, Crowe & Dunlevy, Oklahoma City, Okl., Timothy M. Finnegan, New York City, Alston Jennings, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

DAVID L. RUSSELL, District Judge.

Defendant, United States Tobacco Company, filed a Motion in Limine prior to trial seeking to exclude certain evidence from trial in this suit. The Court orally ruled on the motion prior to trial and now enters this post-trial Order to enlarge upon such ruling.

### I. *Louis Kohley Testimony*

Plaintiff sought admission of testimony of another victim of oral cancer, Louis Kohley, who used defendant's snuff products. Plaintiff offered this testimony to demonstrate that defendant's products caused Sean Marsee's cancer. Plaintiff also offered this testimony on the issues of the effect of defendant's advertising on Sean Marsee and of the pain and suffering of Marsee. Defendant urged exclusion of such "similar occurrence" testimony on the basis that such testimony had little probative value, was unfairly prejudicial, and would have created a "trial within a trial" as to the causation of Kohley's oral cancer. Upon review, the Court agreed with defendant.

The parties did not dispute that there are new cases of oral cancer each year involving both tobacco users and non-users. Clearly, the causation of oral cancer is a complicated issue involving numerous factors. The fact that one other individual using smokeless tobacco also developed oral cancer similar to that suffered by Sean Marsee constitutes very little, if any, proof that smokeless tobacco caused Marsee's cancer. *Cf. In re Agent Orange Product Liability Litigation*, 611 F.Supp. 1223, 1253 (E.D.N.Y.1985) (excluding expert testimony as to link between Agent Orange and Hodgkin's Disease when opinion was based upon review of only seventeen cases).

Likewise, the Court found that the Kohley testimony had little probative value on the issues of pain and suffering and of the effect of advertising. The perception of pain and the effectiveness of advertising are inherently subjective matters which may vary substantially from person to person. The intensity of the pain and suffering perceived by Louis Kohley and the impact of certain advertising on Kohley provides little, if any, proof as to the pain and suffering of Sean Marsee or the impact of the same advertising on Marsee.

Balanced against the low probative value of the Kohley testimony was the probable unfair prejudice of the testimony to defendant. The grim physical condition of Kohley, coupled with the similarities of the Kohley case to Marsee's, might well have led the jury to give the Kohley testimony greater weight than it was due on

the issue of causation of oral cancer. Under these circumstances, in balancing the probative value against the potential prejudice and misleading of the jury, the Court in its discretion excluded the Kohley testimony from plaintiff's case-in-chief. Fed.R. Evid. 403; *see also Moe v. Avions Marcel Dassault-Breguet Aviation,* 727 F.2d 917, 934 (10th Cir.1984), *cert. denied,* 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984).

## II. *Asian Studies*

Defendant sought exclusion of certain studies regarding the effects of smokeless tobacco use on Asian populations. At issue were certain epidemiological studies conducted among populations in Asia directed toward discovering and defining the link, if any, between the use of smokeless tobacco and oral cancer. Defendant argued that the studies were irrelevant and would have been unfairly prejudicial and misleading in this litigation. Defendant based this argument on the existence of distinctions between the substances chewed or dipped in Asia and defendant's products and between the Asian and American populations.

■ The Court viewed these distinctions as relating to the weight rather than the relevance and admissibility of the studies. Without dispute, the studies involved the chewing or dipping of substances which contained smokeless tobacco similar to defendant's products. Further, it appeared from the deposition testimony of the expert witness sponsoring the studies, Dr. Prakash Gupta, that the differences noted by defendant were taken into account in the conclusions reached in the studies. Under these circumstances, the Court found that these studies had significant probative value precluding exclusion under Fed.R.Evid. 402. *Cf. Ellis v. International Playtex, Inc.,* 745 F.2d 292 (4th Cir.1984) (epidemiological studies as to causation of toxic shock syndrome admissible under Rules 803(8)(C) and 403; challenges to methodology and reliability of studies related to weight rather than admissibility); *see also Kehm v. Proctor & Gamble Manufacturing Company,* 724 F.2d 613 (8th Cir.1983).

Similarly, the Court denied exclusion under Fed.R.Evid. 403. Defendant failed to specify the unfair prejudice likely to result from these studies. The low probative worth of the studies which was cited by defendant is not properly considered as an element of undue prejudice in applying the Rule 403 balancing test. *See* 22 C. Wright and K. Graham, *Federal Practice and Procedure* § 5214 (1986 Supp.). Further, defendant had ample opportunity to dispel any confusion of the jury over these studies by articulating the relevant distinctions between Asia and America. In this regard, defendant was afforded the opportunity to cross-examine at great length a principal sponsor of the studies, Dr. Gupta, and such videotaped cross-examination was presented to the jury. Accordingly, Rules 402 and 403 provided no basis for excluding these studies. For these reasons, defendant's Motion in Limine as to the Asian Studies was denied.

## III. *Evidence Regarding Nitrosamines and Polonium 210*

Plaintiff offered evidence regarding the cancer causing effects of nitrosamines and polonium 210. The evidence consisted of animal studies and experiments and expert opinion testimony which indicated that these substances are cancer causing agents in some forty different species of laboratory animals. The expert opinion testimony concluded, based on the animal studies, that these substances are also cancer causing agents in humans.

Defendant contended that this evidence lacked relevance and would only confuse the jury since the evidence only involved tests and experiments on laboratory animals using nitrosamines and polonium 210 in isolation from the other substances in defendant's products. Defendant argued that this evidence provided no proof that its snuff products cause cancer in humans.

■ There was no dispute that both nitrosamines and polonium 210 are present in defendant's snuff products. Further, defendant conceded that animal studies have accurately and consistently demonstrated

that these substances cause cancer in test animals. Finally, the Court found evidence based on experiments with animals particularly valuable and important in this litigation since such experiments with humans are impossible. Under all these circumstances, the Court found this evidence probative on the issue of causation. *Cf. Ramseyer v. General Motors Corporation*, 417 F.2d 859 (8th Cir.1969) (experimental evidence based on testing of automobile gears admitted despite dissimilarities from actual conditions; differences related to weight rather than admissibility of evidence); *see also Kehm*, 724 F.2d at 624 (in-court experiment admitted despite differences from actual conditions which went to the weight of the evidence).

In addition, the Court did not find that such evidence was likely to mislead the jury. Once again, defendant had ample opportunity to illustrate to the jury the difficulties in applying this evidence as to nitrosamines and polonium 210 in determining the effect of defendant's snuff products on humans. In this regard, the defendant had the opportunity at trial to cross-examine the experts who actually conducted the studies at issue. The potential for this evidence to confuse or mislead the jury did not outweigh the probative value of the evidence. Defendant's objection to the admissibility of this evidence under Fed.R.Evid. 402 and 403 was thus overruled.

### IV. *Reports Regarding Causation of Cancer*

Defendant objected to admission of certain reports regarding the causation of cancer. In particular, defendant opposed admission of the Report of the International Agency for Research on Cancer (IARC), the Report of the Consensus Development Conference of the National Institute of Health (CDC), and the Report of the Surgeon General's Advisory Committee on the Health Consequences of Using Smokeless Tobacco. Defendant argued that these reports constituted inadmissible hearsay. Plaintiff sought admission of these reports under the governmental report and catch-

all exceptions to the hearsay rule, Fed.R. Evid. 803(8)(C), 803(24), and 804(b)(5).

■ Upon review, the Court found the Report of the Surgeon General's Advisory Committee to be an authoritative, exhaustive study by a public agency pursuant to law. Accordingly, the Court admitted this report into evidence under the public agency report exception to the hearsay rule, Fed.R.Evid. 803(8)(C).

■ However, the Court was not persuaded that the IARC and CDC Reports qualify for this exception. The reports represent little more than opinions and conclusions drawn from existing research literature casting doubt upon the trustworthiness of the reports for the purposes of Rule 803(8)(C). *See Wetherill v. University of Chicago*, 518 F.Supp. 1387 (N.D.Ill. 1981). Thus, the IARC and CDC Reports were not admissible under Rule 803(8)(C).

■ In addition, the Court did not consider the IARC and CDC reports appropriate for admission under the catch-all exceptions. Since these reports merely repeated a great deal of other material introduced into evidence, the ends of justice did not require the admission of these reports. This is particularly true in view of the fact that much of the information contained in these reports was otherwise admitted into evidence through expert witness testimony. Thus, the Court denied admission of the IARC and CDC reports into evidence as exhibits.

### V. *Marketing Techniques*

To support her claim for punitive damages, plaintiff offered evidence to demonstrate defendant's marketing strategies and techniques for smokeless tobacco. Plaintiff wanted to prove that defendant conducted an aggressive and highly successful marketing effort aimed at adolescent men despite knowledge of the health risks of smokeless tobacco. Plaintiff specifically sought admission of evidence illustrating advertisements by famous athletes, free sample campaigns, and the so-called "graduation process" in which consumers

are introduced to smokeless tobacco through milder products and later "graduated" to stronger products.

Defendant challenged the relevance of evidence regarding the marketing of any product other than Copenhagen brand snuff since, of defendant's products, Sean Marsee used Copenhagen almost exclusively. Defendant argued that evidence of conduct relating to other products which clearly did not cause the injury at issue was not relevant in determining the propriety of punitive damages.

■ Upon consideration, the Court agreed that marketing conduct of defendant evidencing a disregard for the public safety was only relevant to the punitive damages claim if Sean Marsee's illness was attributable in some manner to such conduct. *See Thiry v. Armstrong World Industries,* 661 P.2d 515, 518 (Okla.1983). Accordingly, the Court admitted evidence as to defendant's marketing only to the extent that such marketing influenced Sean Marsee. In this regard, there was evidence that Sean Marsee was influenced in his use of Copenhagen by defendant's advertising and sampling campaigns and, thus, evidence as to these activities was admissible. This included advertising of smokeless tobacco products other than Copenhagen since such advertising may have influenced Marsee in his use of Copenhagen. However, it also appeared that Marsee used none of the alleged "starter products" of defendant and, thus, Marsee was not affected by the "graduation process" in his use of snuff. Consequently, the Court excluded such evidence on the issue of punitive damages as being irrelevant.

## VI. *Addiction Evidence*

Defendant objected to the introduction of evidence to prove that the use of smokeless tobacco is addictive. Defendant maintained that such evidence is irrelevant because there was no proof that Sean Marsee was addicted to smokeless tobacco. In addition, defendant asserted that the meaning of "addiction" in general is unsettled, making evidence as to addiction confusing and

potentially misleading. The Court overruled defendant's objection.

■ Certain evidence was presented indicating that Sean Marsee was unable to completely discontinue the use of snuff even after he learned of his illness and was advised by his physician to stop using smokeless tobacco. The Court considered this evidence as some proof that Sean Marsee was addicted to snuff in the ordinary meaning ascribed to "addiction." Moreover, evidence that snuff is addictive is, in itself, circumstantial evidence that Sean Marsee was addicted to the defendant's products. Accordingly, the Court found evidence as to addiction relevant to the danger of defendant's products to Sean Marsee and the need for a warning of such danger.

The Court further found unpersuasive defendant's argument that this evidence was unduly confusing. While there may be disagreement among experts as to the proper definition of "addiction" when applied to the use of smokeless tobacco, such disagreement reflected on the weight rather than the admissibility of the evidence. The Court did not find the concept of addiction as applied to the use of tobacco so novel, undefined, or speculative as to require exclusion of evidence regarding such addiction. Accordingly, defendant's Motion in Limine was denied as to the addiction evidence.

## VII. *Sales and Earnings Trends*

Plaintiff offered certain evidence as to defendant's sales and earnings trends on the issue of the appropriate amount of punitive damages. Defendant objected to the introduction of such evidence on the grounds that figures showing the net worth of the defendant constituted the only relevant and proper evidence as to the correct amount of punitive damages. Defendant argued that earnings figures would inflame the jury resulting in a finding of liability and an award of punitive damages based solely on defendant's high profits. Defendant also argued that such earnings information would mislead the jury as to

defendant's ability to pay a punitive damages award.

Courts may admit evidence of a defendant's financial condition for the jury to consider in awarding punitive damages. *See Whiteley v. OKC Corp.*, 719 F.2d 1051, 1055 (10th Cir.1983). Information as to financial condition permits the jury to accurately assess the punitive effect of a damage award.

■ Given the purpose of providing the jury with useful information on which to base a punitive damage award, the Court found evidence as to both net worth and earnings history admissible. The Court was not persuaded that the jury would be misled as to defendant's ability to pay a punitive damage award by information as to defendant's earnings. As noted by plaintiff, such information may, in many cases, reduce the likelihood of a jury being misled by the net worth figure alone since earnings may not directly translate into net worth. In any event, defendant had the opportunity to explain and clarify the information presented, to avoid jury confusion.

The admissibility of this evidence is enhanced by *Thiry* in which the Oklahoma Supreme Court expressed the view that an award of punitive damages in a products liability suit should be set at an amount calculated to remove from the defendant the profit realized from sales of its defective product. *Thiry*, 661 P.2d at 518. Clearly, information as to earnings is required to apply this standard in calculating the appropriate amount of punitive damages. Accordingly, the Motion in Limine as to sales and earnings evidence was denied.