**WAL–MART STORES, INC., Individually and Wal–Mart Stores, Inc. D/B/A Sam's Wholesale Club, Petitioners,**

v.

**Sarah ALEXANDER and Sam Alexander, Respondents.**

No. D–2388.

Supreme Court of Texas.

Dec. 8, 1993.

Rehearing Overruled Feb. 2, 1994.

J. Preston Wrotenbery, Houston, Kelly M. Crawford, David R. McAtee, Dallas, for petitioners.

Jeffrey L. Jackson, San Benito, Melchor, Chavez, Brownsville, for respondents.

PHILLIPS, Chief Justice, delivered the opinion of the Court, in which Justices GONZALEZ, HIGHTOWER, HECHT, CORNYN, and ENOCH join.

Sarah Alexander was injured when she fell in front of Wal–Mart's store. The primary issues are whether Wal–Mart had a duty to maintain the area where Mrs. Alexander fell, and, if so, whether there is any evidence that Wal–Mart was grossly negligent. We conclude that although Wal–Mart did have a duty to maintain the area, there is no evidence that its failure to do so constituted gross negligence. We therefore affirm the court of appeals' judgment as to actual damages and reverse as to punitive damages. 827 S.W.2d 420.

I

On January 21, 1989, Sarah Alexander, then 77 years old, fell and broke her hip after tripping over a ⅝″ ridge at the base of a concrete ramp leading from the parking lot to the sidewalk in front of the Sam's Wholesale Club in Brownsville. The Sam's store was owned by Wal–Mart Stores, Inc. ("Wal–Mart"), but Wal–Mart leased the building from Roy L. Martin & Associates ("Martin"). The leased premises included only the area inside the exterior walls, and thus did not include the sidewalk or the ramp area.

The ramp did not exist when the lease was executed. Wal–Mart subsequently built the ramp on its own initiative and at its own expense, apparently for shopping carts. Although the base of the ramp was apparently flush with the parking lot when the ramp was completed, the parking lot subsequently settled after Martin repaved it. The resulting ridge existed by the time the store opened in October 1988.

It is undisputed that Wal–Mart's management knew about the ridge well before Mrs. Alexander's accident. Willie Enriquez, the store's sales manager, stumbled over the ridge in November 1988. Although he apparently did not fall or injure himself, he did scuff his shoes. Enriquez, who considered the ridge a serious safety hazard, informed Robert Guerra, the store's general manager, about the problem. Guerra acknowledged that the ridge had on occasion caused bottles to be jostled from shopping carts, but he did not consider it a safety hazard prior to Mrs. Alexander's accident because no one had ever fallen. Enriquez also testified that he informed Wal–Mart district management in Houston about the ridge in late December 1988 or early January 1989. Wal–Mart repaired the ridge in February 1989, after Mrs. Alexander's accident, at an estimated cost of $400.00.

Mrs. Alexander sued Wal–Mart and Martin for actual and punitive damages, and her husband brought claims for loss of consortium and loss of household services. The Alexanders settled their claims against Martin prior to trial for $60,000. Against Wal–Mart, the jury awarded Mrs. Alexander $285,000 in actual damages and $400,000 in punitive damages, and Mr. Alexander $105,000 in actual damages. The trial court reduced Mrs. Alexander's actual damage award by $100,000, after concluding that the jury had awarded this amount for loss of consortium, to which she was not entitled. The trial court otherwise rendered judgment on the jury's verdict, after offsetting the amount of Martin's settlement. The court of appeals affirmed.

## II

Wal–Mart first argues that it owed no duty to Mrs. Alexander concerning the dangerous condition created by the ridge. While acknowledging the general rule that an occupier of premises owes a duty to use ordinary care to keep the premises in a reasonably safe condition for invitees, *see J. Weingarten, Inc. v. Razey,* 426 S.W.2d 538, 539 (Tex.1968), Wal–Mart contends that it was not the occupier of the area where Mrs. Alexander was injured. Wal–Mart leased from Martin only the area from the exterior walls of its store inward; Martin retained possession of the parking lot, sidewalks, and other common areas. The lease between Wal–Mart and Martin provided as follows:

> "The maintenance by Lessor is to include, without limitation, the following: (a) Maintaining the surfaces of all sidewalks, paved and parking areas in a smooth and evenly-covered condition...."

Since Martin retained possession of the area where Mrs. Alexander fell, and under the lease had an express duty to maintain that area, Wal–Mart contends that it owed no duty.

Wal–Mart's argument is without merit. On its own initiative and at its own expense, Wal–Mart built the ramp after leasing the premises. By so doing, it assumed actual control of the ramp area. A lessee is responsible for those areas adjacent to the demised premises which it actually controls. *See Atchison, Topeka and Santa Fe Ry. v. Smith,* 563 S.W.2d 660, 665–66 (Tex.Civ. App.—Waco 1978, writ ref'd n.r.e.); *Howe v. Kroger Co.,* 598 S.W.2d 929, 930 (Tex.Civ. App.—Dallas 1980, no writ) ("[T]he phrase 'occupier of premises,' as interpreted by Texas courts, means the party *in control* of premises."). *See also* Restatement (Second) of Torts § 328E (1965) (possessor of land includes a person "in occupation of land with intent to control it" regardless of whether the occupation is rightful between the possessor and some third person).

Wal–Mart relies on *Johnson v. Tom Thumb Stores, Inc.,* 771 S.W.2d 582 (Tex. App.—Dallas 1989, writ denied), and *Howe v. Kroger Co., supra,* to support its argument. These cases are not on point, however, as they merely hold that a lessee has no responsibility for premises defects in common areas

that the lessee does not control. 771 S.W.2d at 584–85; 598 S.W.2d at 931. While conceding that it built the ramp where Ms. Alexander fell, Wal–Mart argues that it was not responsible for creating the *ridge* between the ramp and the parking lot which actually caused the fall. Wal–Mart offered evidence that no ridge existed when it completed the ramp. Rather, it contends, the uncontradicted proof established that the ridge formed only after Martin repaved the lot and the new pavement settled from automobile traffic. Our holding, however, is premised not on a factual determination that Wal–Mart created the hazard, but rather on a legal conclusion that it had a duty of reasonable care to maintain the safety of the ramp once it built and exercised control over it.

Wal–Mart argues that the lease expressly imposed a duty on Martin to maintain the parking lot and sidewalks, and that Wal–Mart's installation of the ramp did not relieve Martin of this duty. As Martin is not a party to this appeal, it is unnecessary for us to determine what duty it owed to Mrs. Alexander. Even if Martin did owe a duty of care as the lessor, however, Wal–Mart's duty based on its actual control of the ramp area would remain.

### III

### A

■■■ Wal–Mart next argues that there is no evidence to support the jury's finding of gross negligence. The common-law definition of gross negligence is set forth in *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981):

Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

Without objection from either party as to the form of the definition, the trial court defined gross negligence for the jury in accordance with *Burk Royalty*.[1] This definition, which is unique to Texas, combines the two recognized tests for gross negligence in American jurisprudence: "entire want of care" and "conscious indifference." *See Williams v. Steves Industries, Inc.*, 699 S.W.2d 570, 572–73 (Tex.1985); John Roberson, Comment, *Exemplary Damages for Gross Negligence: a Definitional Analysis*, 33 Baylor L.Rev. 619, 622 (1981). The "entire want of care" test focuses on the objective nature of defendant's conduct, distinguishing gross negligence as being different in degree or quantity from ordinary negligence. *Williams*, 699 S.W.2d at 572; Roberson, *supra* at 622. The "conscious indifference" test focuses on the defendant's mental state, and thus "stresses a qualitative distinction from ordinary negligence." Roberson, *supra* at 622.[2] Under this approach, the actor, although not actually intending to cause harm, must have proceeded with knowledge that harm was a "highly probable" consequence. *See Prosser and Keeton on the Law of Torts*, § 34, at 213 (5th ed. 1984).

■■■ In *Burk Royalty*, the Court emphasized the conscious indifference component, observing as follows:

What lifts *ordinary* negligence into *gross* negligence is the mental attitude of the defendant; that is what justifies the penal

---

1. Mrs. Alexander's accident occurred in 1989, and thus her suit is governed by the 1987 "tort reform" legislation. *See* Acts 1987, 70th Leg., 1st C.S., ch. 4, § 4.05(a) (legislation applies to suits filed on or after September 2, 1987). This legislation contains a slightly different definition of gross negligence:

     "Gross negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.

Tex.Civ.Prac. & Rem.Code § 41.001(5) (Vernon Supp.1993). As neither party objected to the trial court's definition, we need not decide to what extent, if any, the statutory definition differs from the common law articulation of gross negligence.

2. Different jurisdictions use varying terminology to describe the necessary mental state under this approach, including "willful," "wanton," or "reckless" disregard. Prosser and Keeton, *supra* at 212–213.

nature of the imposition of exemplary damages. The plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights, welfare, and safety. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care.

616 S.W.2d at 922. Because of this requirement of conscious indifference, gross negligence can never be the result of "momentary thoughtlessness, inadvertence, or error of judgment." *Id.* at 920. The Court noted, however, that this mental component may be proved indirectly through a defendant's conduct. *Id.* at 922.

After *Burk Royalty*, we continued to emphasize the conscious indifference component of the gross negligence definition. *See, e.g., International Armament Corp. v. King*, 686 S.W.2d 595, 597 (Tex.1985); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex.1983); *Neely v. Community Properties, Inc.*, 639 S.W.2d 452 (Tex.1982). In *Williams v. Steves Industries, Inc.*, 699 S.W.2d 570 (Tex. 1985), however, we made clear that the test for gross negligence contains both an objective and a subjective component. After noting that the Texas definition is a "hybrid" which "combines both of the traditional tests for gross negligence," we explained that grossly negligent conduct must impose an objectively higher risk than ordinary negligence, or, as we said in *Williams*, an *extreme degree of risk*. Id. *at 573. But we also reaffirmed the mental component, holding that the defendant must have subjective awareness of the extreme risk created by its conduct.* Id. Williams *requires both of these prongs to be met.*

■ The "extreme risk" component of gross negligence recognized in *Williams* is consistent with other jurisdictions:

The usual meaning assigned to "willful," "wanton," or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by

a conscious indifference to the consequences.

Prosser and Keeton, *supra* at 213. *See also* James D. Ghiardi and John J. Kircher, *Punitive Damages: Law and Practice*, § 5.01 (rev. 1984) ("[T]he defendant knows, or should have reason to know not only that his conduct creates an unreasonable risk of harm, but also that there is a *strong probability* ... that the harm will result.") (emphasis added). More importantly, this objective element is necessary to clearly distinguish between conduct which is deserving of punishment and that which merely demands restitution. While we recognized in *Williams* that "[n]o exact line can be drawn between negligence and gross negligence," 699 S.W.2d at 573, in general the situation must be such that "the act would reasonably be thought to be highly dangerous...." *Id. See also Port Terminal Railroad Assoc. v. Richardson*, 808 S.W.2d 501, 513 (Tex.App.— Houston [14th Dist.] 1991, writ denied) (inadequate "flagging" by railroad signalman did not constitute evidence of gross negligence, even though he knew of danger to approaching cars); *Terminix, Inc. v. Right Away Foods Corp.*, 771 S.W.2d 675, 681 (Tex. App.—Corpus Christi 1989, writ denied) (exterminator's use of twice the normal level of poison and his failure to adequately instruct the client on safety precautions was not evidence of gross negligence); *Hylander v. Groendyke Transport, Inc.*, 732 S.W.2d 692, 695 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.) (no evidence of gross negligence where truck driver, after suffering a tire blowout at night, reduced his speed to 30 m.p.h. and continued driving in the right-hand lane).

■ We reaffirm that a gross negligence finding may be upheld on appeal only if there is some evidence that a) the defendant's conduct created an extreme risk of harm, and b) the defendant was aware of the extreme risk. With this definition in mind, we turn to the issue of whether any evidence supports the jury's finding of gross negligence in this case.

### B

■ The traditional no-evidence test requires the reviewing court to consider only the evidence favorable to the jury finding

and to disregard evidence to the contrary. *See, e.g., Havner v. E-Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992). We held in *Burk Royalty* that this traditional test should apply to gross negligence findings, 616 S.W.2d at 920, and we also reaffirm that holding. Under this test, however, there must be some evidence that logically supports, either directly or inferentially, both elements of *gross negligence.* Evidence of simple negligence will not suffice to prove either. *See City of Gladewater v. Pike,* 727 S.W.2d 514, 524 (Tex.1987).[3]

We hold that, on the record before us, there is no evidence that Wal-Mart's conduct created an extreme risk of harm. The store had averaged 50,000 patrons per month in the three months it had been open before Mrs. Alexander's accident. There was no evidence that anyone had tripped and fallen over the ridge before she did, and evidence that only one person, Enriquez, had as much as stumbled there. Instead, Wal-Mart's complaints from patrons involved only bottles and other items falling from shopping carts. The negligent failure to warn of or repair timely this defect simply did not impose an *extreme risk* creating the *likelihood* of serious injury.

While accepting the validity of the "extreme risk" component of gross negligence, the dissent appears to argue that any hazard that could potentially cause serious injury must be considered extreme. Post at 333. Although it was certainly conceivable that Wal-Mart's failure to repair the ridge could result in a serious injury, this conclusion is true for virtually all negligent conduct in a personal injury context. The dissent's approach would inevitably eliminate any meaningful distinction between negligence and gross negligence. Such an approach is clearly inconsistent with *Williams,* where this Court held that allowing an unlicensed driver to operate an eight-ton equipment repair truck did not create an extreme risk justifying a punitive award as a matter of law.[4]

Having concluded that there is no evidence on this record of an extreme degree of risk, we need not and indeed cannot consider the second prong; whether there is any evidence that Wal-Mart was aware of such a risk. Wal-Mart's negligent maintenance of the ridge resulted in a judgment to Mrs. Alexander for actual damages of $155,000 plus prejudgment and postjudgment interest and costs, all of which we affirm. But there is no evidence that this ridge was so highly dangerous that it constituted an extreme risk creating the likelihood of serious injury. Accordingly, we reverse the judgment of the court of appeals on this issue, and render judgment that Mrs. Alexander take nothing on her claim for punitive damages.[5]

### IV

Wal-Mart next challenges a portion of Mr. Alexander's damage award. Question four asked the jury to assess one amount as Mr. Alexander's damages, considering "loss of household services" and "loss of consortium." The jury returned an answer of $105,000, indicating in the margin of the question sheet that $5,000 of its award was allocated to loss of household services and $100,000 was allocated to loss of consortium. Wal-Mart contends that we may consider the jury's margin notes as separate damage awards, and argues that the $100,000 award

---

3. The 1987 tort reform act codifies the rule that evidence of ordinary negligence cannot satisfy plaintiff's burden of proving gross negligence. Tex.Civ.Prac. & Rem.Code § 41.003(b) (Vernon Supp.1993).

4. The dissent cites a memorandum marked with the notation "sense of urgency." 868 S.W.2d 332. This was a computer generated checklist of "to do" items on which Enriquez had penciled a note to call the district management about the "front entrance curb," and at the bottom had written "sense of urgency." Although the evidence regarding the meaning of this note is disputed, in a no evidence review, we must make all reasonable inferences supporting the verdict. Thus, while we must accept as true that Enriquez considered repair of the ridge urgent, that does not ipso facto make the defect an extreme degree of risk under *Williams.*

5. Wal-Mart contends in a separate point of error that the trial court erroneously admitted evidence of its gross sales. The thrust of Wal-Mart's argument is that this evidence prejudiced the jury's award of punitive damages. Because we vacate the punitive damage award for lack of evidence of gross negligence, we need not reach the gross sales issue.

should be vacated because there is no evidence that Mr. Alexander suffered a loss of consortium.

▮ A jury's marginal notations generally may not be considered on appeal. *See First National Bank in Dallas v. Zimmerman,* 442 S.W.2d 674, 677–78 (Tex.1969). They reflect the jury's mental processes, but they are not part of its verdict. *Id.* at 678. Wal–Mart contends that the present case is distinguishable from *Zimmerman* because the trial court, without objection from the Alexanders, used the jury's margin notes in question three as a basis for reducing Mrs. Alexander's actual damages.[6] Because the Alexanders allowed the trial court to use the question three margin notes, Wal–Mart urges, they may not challenge this Court's authority to consider the question four margin notes.

▮ Even if the damage elements may be reviewed separately as advocated by Wal–Mart, an issue we do not decide, Wal–Mart's argument that there is no evidence of any loss of consortium damages fails. Spousal consortium is generally defined as "the mutual right of the husband and wife to that affection, solace, comfort, companionship, society, assistance, and sexual relations necessary to a successful marriage." *Whittlesey v. Miller,* 572 S.W.2d 665, 666 (Tex.1978). In determining whether there is any evidence of loss of consortium, we consider only the evidence and inferences that tend to support the finding, disregarding all evidence and inferences to the contrary. *See Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

Applying this standard of review, the record reflects that, prior to the accident, the Alexanders spent most of their time together, enjoying walking, gardening, and fishing. Now, Mrs. Alexander has difficulty walking

and bending. They no longer engage in their outdoor activities, and instead spend much of their time watching television. The Alexanders also traveled regularly before the accident, but this has become very difficult because of Mrs. Alexander's condition. The foregoing is at least some evidence that Mr. Alexander has suffered a loss of consortium.[7]

Wal–Mart relies on *Delta Drilling Co. v. Cruz,* 707 S.W.2d 660 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.), where the court held that testimony from the primary victim concerning activities in which he engaged with his family was no evidence of his wife's loss of consortium. The court of appeals' summary of the evidence in *Cruz* does not indicate that the husband's injury interfered with the family activities, 707 S.W.2d at 667, and thus *Cruz* is distinguishable from the present case.

## V

▮ Wal–Mart finally argues that the trial court erred by supplying a dictionary to the jury during its deliberations. The jurors requested a dictionary because they were unsure of the meaning of "flagrant." All parties agreed that the court should supply a dictionary, which it did. Wal–Mart argues that this was fundamental error, which may be asserted on appeal even though Wal–Mart agreed to the court's action.

Fundamental error exists "in those rare instances in which the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas." *Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982). We express no opinion as to whether the trial court's action was error at all, but we do hold that, if

---

6. The jury awarded $120,000 to Mrs. Alexander for future damages, considering the elements of mental anguish, physical impairment and loss of consortium. In the margin, the jury indicated that $100,000 of this amount was allocated to Mrs. Alexander's loss of consortium. Wal–Mart argued to the trial court that loss of consortium was not a proper element of damage for the primary victim, and thus Mrs. Alexander's future damage award should be disregarded in its entirety or, alternatively, reduced by $100,000. The Alexanders did not dispute the trial court's

authority to consider the margin notes to reduce, rather than entirely disregard, the jury's answer, and the trial court did reduce Mrs. Alexander's damages by $100,000.

7. Wal–Mart argues only that there is no evidence of loss of consortium. It does not alternatively argue that, if there is some evidence, it is legally insufficient to support damages of $100,000, and we therefore express no opinion on this issue.

it did constitute error, it did not directly and adversely affect the public interest.

We accordingly affirm the judgment of the court of appeals as to the award of actual damages to Mr. and Mrs. Alexander. We reverse the judgment of the court of appeals as to punitive damages, and we render judgment that Mrs. Alexander take nothing on her punitive damage claim.

GONZALEZ, Justice, concurring.

I agree with the Court's opinion and judgment. I write separately, however, to address the following issues: 1) the need for bifurcated trials when punitive damages are sought, 2) the admissibility of gross sales as evidence of net worth, and 3) the types of information which are discoverable in determining net worth.

*Bifurcation*

We held in *Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex.1988), that evidence of a defendant's net worth is relevant and discoverable [1] in determining the proper amount of punitive damages. This decision aligned Texas with the overwhelming majority of other jurisdictions on this issue. *See id.* at 472 n. 2. As noted in *Lunsford*, the amount of punitive damages necessary to punish and deter wrongful conduct depends on the financial strength of the defendant. "That which could be an enormous penalty to one may be but a mere annoyance to another." *Id.* at 472.

However, evidence of a defendant's net worth, which is generally relevant only to the *amount* of punitive damages, potentially prejudices the jury's determination of the other issues in a tort case. We should hold therefore, that if presented with a timely motion by either party, the trial court should bifurcate the determination of the amount of punitive damages from the remaining issues. *Id.* at 474–75 (Gonzalez, J., dissenting on motion for rehearing). Under this approach, the jury first hears evidence relevant to liability for actual damages, the amount of actual damages, and liability for punitive damages (e.g., gross negligence), and returns findings on these issues. If the jury finds liability for punitive damages, the same jury is presented with evidence of the defendant's net worth, plus any other evidence relevant only to the amount of punitive damages. The jury then determines the proper amount of punitive damages, considering the totality of the evidence presented at both phases of the trial.

The American Bar Association, American Law Institute, and American College of Trial Lawyers all advocate bifurcation in punitive damage trials.[2] In addition, at least eleven states now require bifurcation of trials in which punitive damages are sought.[3] Eight of these, California, Georgia, Missouri, Montana, Nevada, Tennessee, Utah, and Wyoming, generally follow the procedure outlined above, in which the *amount* of punitive damages is bifurcated from the remaining issues. The other states require bifurcation of the entire punitive damage claim, including liability and amount. I believe the former approach is preferable, as evidence relevant to punitive damage *liability*, such as evidence of gross negligence, will also generally be relevant to actual liability. Bifurcating only the determination of the amount of punitive damages eliminates the most serious risk of prejudice, while minimizing the confusion and inefficiency that can result from a bifurcated trial. *See Lunsford*, 746 S.W.2d at 474–75 (Gonzalez, J., dissenting on motion for re-

---

1. Discovery of net-worth evidence was the only issue addressed by the majority in *Lunsford*.

2. American Bar Association, ABA Blueprint For Improving the Civil Justice System: A Report of the ABA Working Group on Civil Justice System Proposals (1992); 2 American Law Institute, Reporter Study of Enterprise Responsibility for Personal Injury 264 (Paul C. Weiler report., 1991); American College of Trial Lawyers, Report on Punitive Damages of the Committee on Special Problems in the Administration of Justice 18–19 (1989).

3. Cal.Civ.Code § 3295(d) (West Supp.1993); Ga. Code Ann. § 51–12–5.1 (Michie Supp.1992); Kan.Stat.Ann. § 60–3702(a) (Supp.1992); Minn. Stat.Ann. § 549.20(4) (West Supp.1993); Mo. Ann.Stat. § 510.263 (Vernon Supp.1993); Mont. Code Ann. § 27–1–221(7) (1993); Nev.Rev.Stat. Ann. § 42.005(3) (Michie 1992); N.J.Stat.Ann. § 2A:58C–5(b) (West 1987); Utah Code Ann. § 78–18–1 (1992); *Campen v. Stone*, 635 P.2d 1121, 1132 (Wyo.1981); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901–02 (Tenn.1992).

hearing); *Id.* at 477 (Phillips, C.J., dissenting on motion for rehearing). *See also,* John L. Meredith, *Bifurcated Trials—When to Expose Net Worth?* 12 The Advocate, State Bar Litigation Section Report, 154 (October 1993) (discussing procedural aspects of "Wyoming plan").

### Admissibility of Evidence of Gross Sales

In the case before us, Wal–Mart vigorously objected to the plaintiff's introduction of evidence of gross sales. The trial court overruled the objection and evidence was adduced that Wal–Mart had gross sales of about $5 million in January 1989. In closing argument, the plaintiff's attorney used this evidence to suggest to the jury that they should utilize gross sales to measure the punitive damage award to the plaintiff. In reviewing the punitive damage award, the court of appeals held it would not follow the reasoning of *Southland Corp. v. Burnett,* 790 S.W.2d 828, 830 (Tex.App.—El Paso 1990, no writ) (holding that admission of evidence of defendant's gross receipts was reversible error) due to the court's conclusion that admission of the evidence was not "harmful error." 827 S.W.2d 420, 425. In its first point of error to this Court, Wal–Mart alleges that the admission of evidence of gross sales was harmful error as a matter of law. The majority does not address this point because it concludes that it is unnecessary since there is no evidence of gross negligence.

This Court in *Lunsford* failed to define net worth and failed to suggest a procedure for placing such evidence before the jury.[4] I predicted then that in the absence of guidance from this Court, "confusion will prevail as practitioners and judges attempt to ascertain the components of 'net worth.'" *Lunsford,* 746 S.W.2d at 475.

Conflicting appellate court decisions on the meaning of the term "net worth" are evidence of the confusion surrounding this fundamental issue. *See Southland Corp. v. Burnett,* 790 S.W.2d 828 (Tex.App.—El Paso

1990, no writ) (admission of gross sales on issue of punitive damages constitutes harmful error); *Miller v. O'Neill,* 775 S.W.2d 56 (Tex. App.—Houston [1st Dist.] 1989, orig. proceeding) (order denying discovery of income tax returns and net worth statements was abuse of discretion); *Delgado v. Kitzman,* 793 S.W.2d 332, 333 (Tex.App.—Houston [1st Dist] 1989, orig. proceeding) (order denying discovery of income tax returns and net worth statements was abuse of discretion);[5] *K–Mart Corp. v. Pearson,* 818 S.W.2d 410 (Tex.App.—Houston [1st Dist.] 1991, no writ) (gross sales, net income, and net worth all admitted into evidence). This confusion should be resolved by this Court. In the absence of a resolution, however, I will once again offer my suggestions on this matter.

The courts have utilized the term "net worth" in punitive damage cases to describe the wealth or means of defendants. *Lunsford,* at 471–73. However, the term has not been further defined in this state. Is net worth purely the capital of an entity—the entity's assets minus its liabilities, or is net worth a more fluid concept, based on net income and the earning capacity of the entity?

Other jurisdictions have struggled with the issue of what constitutes "net worth." *See,* Annotation, *Punitive damages: Relationship to Defendant's Wealth as Factor in Determining Propriety of Award,* 87 A.L.R. 4th 141 (1991); Martin J. McMahon, Annotation, *Discovery of Defendant's Sales, Earnings, or Profits on Issue of Punitive Damages in Tort Action,* 54 A.L.R. 4th 998 (1987). Many jurisdictions allow discovery and admission of evidence of net income as well as the capital of the entity. 87 A.L.R. 4th 141. Although a well-entrenched fear exists in our legal system that jury determinations would be biased by evidence of the relative wealth of the parties, the jury must have enough information to assess the true means of the defendant. Evidence of net earnings history may

---

4. The majority in *Lunsford* wrote: "We view as unnecessary and ill-advised any attempt on the limited record before us to address admissibility concerns ... pertaining to when net worth is admissible, how it will be admitted, or what it means." 746 S.W.2d at 473 n. 4.

5. A tax return does not itself show the net worth or financial condition of the person or entity filing the return.

reduce the likelihood of a jury being misled by the net worth figure alone since a defendant's earnings may not directly translate into net worth. *Marsee v. United States Tobacco Co.*, 639 F.Supp. 466, 472 (W.D.Okla. 1986), *aff'd*, 866 F.2d 319 (10th Cir.1989); Gerald R. Powell and Cynthia A. Leiferman, *Results Most Embarrassing: Discovery and Admissibility of Net Worth of the Defendant*, 40 Baylor L.Rev. 527, 529–32 (1988). A rule which limits admissibility only to assets minus liabilities may exclude relevant evidence and impede the goal of determining the true wealth of a defendant. On the other hand, because financial evidence is so potentially prejudicial, courts must be especially sensitive when reviewing this evidence under Rule 403 of the Texas Rules of Civil Evidence.

Not all financial information relating to a defendant will be relevant to its net worth. A corporate defendant's assets are irrelevant in determining its wealth until its liabilities are subtracted. Similarly, a company's gross sales are only remotely related to its wealth until the company's expenses are subtracted. In order to avoid prejudice, parties should not be allowed to tell only part of the story. Only evidence which allows the jury to assess the wealth of the defendant without requiring the jury to make calculations should withstand review under Rule 403. Under this standard, gross sales would be clearly inadmissible.

The court of appeals held that the admission of gross sales evidence over objection was not reversible error because there was other evidence in the record of Wal–Mart's "financial strength." The evidence the court of appeals alludes to is the "size and volume of Sam's and Wal–Mart," the amount of the lease payment, and a provision in the lease for self insurance. In today's economic climate, size and sales volume can be very misleading. It is not uncommon for "big" companies to file for bankruptcy. Without evidence of Wal–Mart's liabilities, the evidence the court of appeals finds persuasive is irrelevant to determining net worth. Be-

cause the evidence only tells part of the story, it tainted the punitive damages award. We should hold that the only evidence which is admissible at trial on the issue of net worth is the net income of the defendant and the defendant's capital—its assets minus its liabilities.

### Information Discoverable to Determine Net Worth

It is also important to delineate the types of information which are discoverable in determining net worth. Discovery of certain types of financial information raises privacy concerns. For example, this Court has recognized that there should not be uncontrolled and unnecessary discovery of federal income tax returns. *Maresca v. Marks*, 362 S.W.2d 299, 300–01 (Tex.1962) (orig. proceeding); *Crane v. Tunks*, 160 Tex. 182, 328 S.W.2d 434, 440 (1959) (orig. proceeding), *rev'd on other grounds, Walker v. Packer*, 827 S.W.2d 833, 842 (Tex.1992).[6] As a result, this Court issued a writ of mandamus to protect tax returns from discovery in a suit seeking punitive damages when the corporation had already provided certified and audited annual reports. *Sears, Roebuck & Co. v. Ramirez*, 824 S.W.2d 558, 559 (Tex.1992) (orig. proceeding); *see also Chamberlain v. Cherry*, 818 S.W.2d 201, 205–07 (Tex.App.—Amarillo 1991, orig. proceeding) (tax returns not relevant as evidence of net worth where relator makes no claim that other financial statements revealing net worth were requested and were not available). Therefore, trial courts should not allow discovery of private financial records, such as tax returns, when there are other adequate methods to ascertain net worth, such as audited financial reports or W–2 statements.

Finally, another problem with unlimited discovery of financial information is the potential for abuse. If all that is required for discovery of sensitive, private, and confidential financial information in tort actions is the mere assertion of gross negligence in a

---

6. In *Maresca*, the Court wrote the following concerning the privacy interest persons have in their tax returns: "The protection of privacy is of fundamental-indeed, of constitutional-importance. Subjecting federal income tax returns of our citizens to discovery is sustainable only because the pursuit of justice between litigants outweighs protection of their privacy. But sacrifice of the latter should be kept to the minimum...." 362 S.W.2d at 301.

pleading, needless abuse and harassment could result. I suggest that a plaintiff be required to demonstrate. a factual basis for its punitive-damage claim before this type of sensitive information is allowed to be discovered. At least twelve jurisdictions now follow this approach,[7] and it is also urged by the American College of Trial Lawyers.[8] Otherwise, this information will be discoverable in every garden-variety fender bender case.

It is unfortunate that these important issues were not addressed today by the Court's opinion.

DOGGETT, Justice, joined by GAMMAGE and SPECTOR, JJ., dissenting.

A fall at a ridge adjacent to a concrete entrance ramp in Brownsville meant an unexpected broken hip for 71-year-old Sarah Alexander but came as no big surprise to the store's management. At trial, Wal–Mart acknowledged its conscious awareness of the danger which the ridge posed to customers. A jury of twelve ordinary Texans determined that the company's failure to make $400 in ridge repairs that it knew were necessary constituted "conscious indifference to the right[s] or welfare" of those entering the store, including Mrs. Alexander. Today's opinion, however, pardons the wrongdoer from this community judgment. To the majority, this undisputed failure to make safe the premises and thereby prevent serious harm to an older Texan is just not important enough to merit the use of a deterrent afforded by a long established legal remedy.

### I.

Prior to Mrs. Alexander's injury, the store's sales manager, safety committee, general manager, and corporate management in Houston were fully familiar with this particular condition. To the store manager, aware that merchandise was dislodged and damaged when shopping carts encountered this irregularity, it represented a problem. To the sales manager, who, despite his familiarity with the ridge, had personally experienced a mishap there, it posed a serious safety hazard. To the safety committee, this danger involved a "sense of urgency" and demanded a remedy for which a specific construction bid was obtained and faxed to district management in Houston.[1] All of them knew that the elderly customers who were urged to frequent their. business could be seriously harmed by a fall at this trouble spot, which could be eliminated at minimal cost. But despite this very real risk, apparently unresponsive corporate management failed to act. Indeed, Wal–Mart continues to deny any legal responsibility for this ridge, which arose on leased property at the very spot where it had constructed an entrance ramp. At least, today's opinion does not accept their "take it up with our landlord" defense.

In reviewing a "no evidence" point, this court "must consider only the evidence and inferences tending to support the jury's finding, viewed most favorably in support of the finding, and disregard all contrary evidence and inferences." *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992); *State v. $11,014.00*, 820 S.W.2d 783 (Tex. 1991) (per curiam); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). Today's opinion, 868 S.W.2d at 327, cites *Havner* and correct-

---

**7.** Fla.Stat.Ann. ch. 768.76 (Harrison Supp.1991); Idaho Code § 6–1604 (1990 & Supp.1992); Ill. Ann.Stat. ch. 110, ¶ 2–604.1 (Smith–Hurd Supp. 1992); Iowa Code Ann. § 668A.1(3) (West 1987); Minn.St.Ann. § 549.191 (West 1988 & Supp. 1992); Mont.Code Ann. § 27–1–221 (1993); Ark. R.Civ.P. 26(b)(1); *Curtis v. Partain*, 272 Ark. 400, 614 S.W.2d 671 (1981) (holding limited in *Lupo v. Lineberger*, 313 Ark. 315, 317, 855 S.W.2d 293, 294 (1993)); *Leidholt v. District Court in and for City and County of Denver*, 619 P.2d 768, 771 (Colo.1980); *Mutual Life Ins. Co. v. Estate of Wesson*, 517 So.2d 521 (Miss.1987), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); *Herman v. Sunshine Chemical Special-*

*ties, Inc.*, 133 N.J. 329, 627 A.2d 1081 (1993); *Palmisano v. Toth*, 624 A.2d 314, 320 (R.I.1993); *Campen*, 635 P.2d at 1132 (Wyo.1981).

**8.** Am.Coll. of Trial Lawyers, *supra* note 2, at 17–18.

**1.** As sales manager Enriquez testified:
    Q: "Sense of urgency." You were concerned about that, weren't you?
    A: Uh–huh.
    Q: You were actually aware that a hazard existed out there and that somebody might trip and hurt themselves?
    A: That's correct.

ly "reaffirm[s]" the holding of *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920–921 (Tex. 1981) (emphasis in original) that

> In testing a jury finding of gross negligence, the same no evidence test should apply as to any other fact issue. The plaintiff has the burden to prove that the defendant was grossly negligent. If the jury finds gross negligence, the defendant has the burden of establishing that there is *no evidence* to support the finding.

But having accurately stated this well established law, the majority declines to follow it.

After conceding Wal–Mart's "undisputed" knowledge of this risk and declaring that the probability of the occurrence of harm is central to determining whether a risk is "extreme," 868 S.W.2d at 324, the majority refuses to accept the evidence in this case demonstrating a significant likelihood that a customer would eventually be caused serious injury. Not only was there some evidence of this, but as the court of appeals correctly concluded the "[e]vidence that [Wal–Mart] knew of the danger and ignored it was strong." 827 S.W.2d at 424. Nowhere does the majority explain how it can categorize as *no* evidence the very *real* evidence of awareness of this hazard by the sales manager, the safety committee, the store manager, and district management in Houston.

Although its summary of the law of gross negligence suffers from a lack of clarity,[2] I join fully in the majority's reaffirmation of

2. Unfortunately, the majority's discussion of gross negligence is confused by the use of the terms "objective" and "subjective" in several different contexts. *Williams v. Steves Industries*, 699 S.W.2d 570, 573 (Tex.1985), identifies objective and subjective tests as alternative means of establishing the requisite mental state of gross negligence:

> We held in *Burk Royalty* that the defendant's state of mind distinguishes gross negligence from negligence; however, we also recognized that a test requiring the plaintiff to prove gross negligence by direct evidence of a defendant's subjective state of mind would leave outrageous conduct unpunished. Therefore, we held that "[a] mental state may be inferred from actions. All actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in deciding if there is some evidence of gross negligence." *Burk Royalty*, 616 S.W.2d at 922.

We reaffirm our holding in *Burk Royalty* that the plaintiff need not prove the defendant's subjective state of mind by direct evidence. Thus, the test for gross negligence is both an objective and subjective test. A plaintiff may prove a defendant's gross negligence by proving that the defendant had actual subjective knowledge that his conduct created an *extreme* degree of risk. In addition, a plaintiff may objectively prove a defendant's gross negligence by proving that *under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others.* (emphasis added). In *Clifton v. Southern Pacific Transp. Co.*, 709 S.W.2d 636, 640 (Tex.1986), we reiterated that

> Requiring the plaintiff to prove gross negligence only by direct evidence of a defendant's subjective state of mind ... raises an almost insurmountable barrier to recovery. Recognizing this dilemma, we held in *Burk Royalty* that a mental state may be inferred from actions. Considering all actions or circumstances indicating a state of mind amounting to conscious indifference to the rights of others, a plaintiff may objectively prove a defendant's gross negligence by proving that, under the surrounding circumstances, a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others.

(citations omitted). *See, also Greater Houston Transp. Co. v. Zrubeck*, 850 S.W.2d 579, 591 (Tex.App.—Corpus Christi 1993, writ denied); *Payne v. Cinco Ranch Venture, T.M.C.*, 822 S.W.2d 364, 366 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Wal–Mart Stores v. Berry*, 833 S.W.2d 587, 593 (Tex.App.—Texarkana 1992, writ requested); *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 690 (Tex.App.—Texarkana 1991, writ denied), *cert. denied*, —— U.S. ——, ——, ——, 113 S.Ct. 2339, 3037, 3064, 124 L.Ed.2d 250 (1993); *Orkin Exterminating Co. v. Williamson*, 785 S.W.2d 905, 913 (Tex.App.—Austin 1990, writ denied); *Deerings West Nursing Center v. Scott*, 787 S.W.2d 494, 497 (Tex.App.—El Paso 1990, writ denied); *Elbar, Inc. v. Claussen*, 774 S.W.2d 45, 48 (Tex.App.—Dallas 1989, writ dism'd); *Wright v. Gifford–Hill & Co.*, 736 S.W.2d 828, 831 (Tex.App.—Waco 1987, writ ref'd n.r.e.); *Lawrence v. TD Industries*, 730 S.W.2d 843, 845 (Tex.App.—Dallas 1987, writ ref'd n.r.e.); *Denham v. United States*, 834 F.2d 518, 522 (5th Cir.1987) ("Texas courts have made clear that the state of mind required to constitute gross negligence can be shown by objective evidence ... proving that, under the circumstances, a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others."); *Toomer v. United Resin Adhesives, Inc.*, 652 F.Supp. 219, 225–26 (N.D.Ill.1986) (Texas law allows proof of "defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others.").

*Burk Royalty* and *Williams v. Steves Industries,* 699 S.W.2d 570 (Tex.1985)—particularly the principle that gross negligence involves "such an entire want of care as ... shows the act or omission was the result of conscious indifference...." 616 S.W.2d at 922 and requires more than "momentary thoughtlessness, inadvertence, or error of judgment." *Id.* at 920. But since applying that law here will not achieve the result that it so desperately desires, the majority ignores and defines away evidence from which a jury could easily conclude that what occurred here was not "momentary thoughtlessness" but "conscious indifference."

## II.

Based on the facts in *Williams,* we concluded that entrusting a commercial truck to one who has a safe driving record, but who is

> without a license creates an unreasonable risk but does not involve such a high degree of risk that a jury could objectively determine that the defendant did not care whether the driver would injure someone

699 S.W.2d at 574. Hence today's opinion is hardly novel in requiring as a prerequisite for gross negligence that the risk involved be "extreme" or of a high degree; what is unique about the current writing is the manipulation of this single word to vaporize very real evidence. Instead of reasoned discussion, the majority applies a catchword. Giving absolutely no guidance as to what makes a risk "extreme," today's opinion insists that a corporate manager's plea to higher management for "urgent" action to remedy a known safety hazard constitutes no evidence whatsoever. 868 S.W.2d at 327 n. 4. If it can so easily and inexplicably eliminate the evidentiary significance of such an admission, this majority can simply squelch by branding as "non extreme" any legitimate evidence that stands in the way of a preferred outcome. Such use of the term "extreme" merely provides another elastic device for an appellate court to sweep away any evidence inconsistent with the result it wants.

To the extent that what makes a risk "extreme" is a function of any thing other than a judicially desired result, the sole determinant appears to be the probability that harm will occur. Although there is certainly some evidence here of such a probability, this is only one determinant of the "extremity" of a risk; equally important is the character of the wrongful conduct involved. Punitive damages should be tied to the outrageousness of that conduct. In *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981), we noted that in determining the reasonableness of the *amount* of an exemplary damages verdict, an appellate court must consider 1) the nature of the wrong, 2) the character of the conduct involved, 3) the degree of the culpability of the wrongdoer, 4) the situation and sensibilities of the parties concerned, and 5) the extent to which such conduct offends a public sense of justice and propriety. 616 S.W.2d at 910.[3] While that holding did not expressly mandate a jury's evaluation of these considerations in determining gross negligence, these factors are at least as important to assessing the threshold question of *liability* for punitive damages as to determining their amount.

With the focus in *Kraus* on the degree to which the defendant's conduct defies societal behavioral norms, evidence relating to those factors is critical to determining whether there is some evidence that the defendant created an extreme risk to the welfare or safety of others. A "risk" is any "factor, element, or course involving uncertain danger." AMERICAN HERITAGE DICTIONARY 1065 (2d college ed. 1985). Thus, only by examining the course of the defendant's conduct may the factfinder determine the extremity of the risk it created.

For example, in assessing whether a product manufacturer was grossly negligent, the factfinder must consider evidence of the extent of the defendant's safety tests, the cost and availability of safety measures it chose not to implement, and the magnitude of the potential harm to consumers created by the defect. Such proof goes to the nature, char-

---

**3.** A committee charged with guiding the bench and bar in the proper preparation of jury instructions has recommended that these factors be considered by the jury in certain cases. *See* 2 STATE BAR OF TEXAS, TEX.PATTERN JURY CHARGES § 29.03 (1989) ("Good Faith and Fair Dealing").

acter, and degree of culpability of the defendant's wrong, and the extent to which its conduct offends a public sense of justice and propriety, and that evidence is therefore central to the deterrent and retributive purposes of punitive damages. *See Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991) (listing "the degree of reprehensibility" and "profitability" of defendant's conduct as factors for "determining whether a punitive award is reasonably related to the goals of deterrence and retribution"). Such evidence has, for example, been regularly taken into account in those many determinations of punitive damages prompted by "explicit decisions to continue marketing highly dangerous products rather than make inexpensive corrections."[4] As a restraint on the type of appellate adventurism that has occurred here, all of the *Kraus* factors should be considered in determining whether a risk is extreme.

To discard as completely meaningless the jury verdict for Mrs. Alexander, the majority insists that there is *no* evidence that an "extreme degree of risk" was presented by a hazard viewed by Wal–Mart's own safety committee as demanding immediate repair. This record shows that, absent the recommended remedial action, it was simply a matter of time until the occurrence of a more serious mishap. How very fuzzy the majority has left the line between "extreme" and "nonextreme" risks. Indeed, "extreme" would seem a term more fitting to describe the majority's own philosophy on this subject. Implicitly rationalizing its conclusion on grounds that Mrs. Alexander was the first to be hospitalized as a result of this hazard, the majority summarily declares "there is no evidence that this ridge was so highly dangerous that it constituted an extreme risk creating the likelihood of serious injury." 868 S.W.2d at 327. Since when is it necessary that one Texan be hospitalized or buried before another can show an "extreme" risk of harm? Apparently not until today's writing, which simultaneously declares that an incapacitating broken hip for an older Texan is just not sufficiently "serious" to meet a newly announced standard.

The only further insight offered to its thinking is the majority's recurrent fear of our right to trial by jury. Unless this court implements its own social policy judgment in deciding when a risk is "extreme," we are told that there will be a tendency to raise a fact issue of gross negligence whenever a prima facie case of ordinary negligence is raised. *Id.* at 327. But "[w]hat lifts *ordinary* negligence into *gross* negligence is the mental attitude of the defendant." *Burk Royalty*, 616 S.W.2d, at 922. Despite knowledge of what its own manager viewed as an

---

**4.** Michael J. Saks, *Do We Really Know Anything About the Behavior of the Tort Litigation System— And Why Not?* 140 U.PA.L.REV. 1147, 1261 (1992). In one such decision, involving the design of the Pinto automobile, the court found evidence of the availability and low cost of safer alternative designs highly indicative of a conscious disregard for consumer safety. *See Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981). Aware that the Pinto's gas tank could not withstand rear-end collisions of 20 miles per hour, Ford still refused to implement $15.30 per vehicle design changes that could have made the tank safe in a rear impact of 34–38 miles per hour. *Id.* 174 Cal.Rptr. at 361. For an additional $5 to $10 per unit, the tank could have endured a rear collision of 50 miles per hour or more. *Id.*

Other courts have taken similar evidence into account. *See Dorsey v. Honda Motor Co.*, 655 F.2d 650, 654–55 (5th Cir.1981) (upholding punitive damage verdict based partly on evidence that defendant failed to implement feasible design alternatives that would have made its car crash-

worthy); *Gillham v. Admiral Corp.*, 523 F.2d 102, 107–08 n. 3 (6th Cir.1975) (noting potential relevance of fact that defendant failed to add safety features to its television sets that would have cost 60 cents per unit and prevented plaintiff's severe burns); *Jardel Co. v. Hughes*, 523 A.2d 518, 531 (Del.1987) ("economic decision may be the basis for punitive damages ... if the economic cost is intentionally weighed against a perceived risk"); *Leichtamer v. American Motors Corp.*, 67 Ohio St.2d 456, 424 N.E.2d 568, 580 (1981) (evidence of inadequate testing of jeep's capability of surviving roll-overs sufficient to support exemplary damages); *Gryc v. Dayton–Hudson Corp.*, 297 N.W.2d 727, 740 (Minn.1980) (upholding punitive award in part based on evidence that defendant chose to use unsafe pajama design because cost of flame retardant was too high, though it would not make product unmarketable); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 462 (1980) (punitive damages assessed against manufacturer which refused to recall automobile with defectively designed gas tank to "avoid paying the costs of recall and repair and ... avoid the accompanying bad publicity").

"urgent" risk, Wal–Mart nonetheless chose to do nothing about it. Evidence of a knowing or conscious disregard or indifference to this extreme risk is what permitted this jury to find that the conduct constituted gross negligence.

### III.

Our law does not countenance the conversion of every instance of ordinary negligence into a case of gross negligence. Nor should this Court uphold any verdict of punitive damages that is not supported by legally sufficient evidence. But exemplary damages do form a well established part of our jurisprudence—they are designed to promote societal interests in health, safety and confidence in law enforcement. By disregarding very real evidence presented in this particular case, the majority has replaced the jury's right to enforce a community standard with its own standard of permissiveness. Consistent with its increasing disfavor of decision-making by ordinary citizens composed as a jury,[5] the majority essentially reconstitutes itself as a superjury in Austin. In a radical step, disguised as a routine no evidence review, the majority effectively transforms the gross negligence finding in at least this case into an issue of law for the court. When a court erases a verdict finding punitive damages on a record that unquestionably contains some evidence of conscious disregard for a known and extreme risk, then the right of trial by jury is rendered meaningless. This disrespect for the jury, one of this nation's central democratic institutions, is fundamentally at conflict with the role of American legal institutions envisioned by one of history's most respected commentators on our political system:

> [I]n the United States [a citizen] is personally interested in enforcing the obedience of the whole community to the law …

because it is his own, and he regards it as a contract to which he himself is a party. ALEXANDER DE TOCQUEVILLE, DEMOCRACY IN AMERICA 247–48 (F. Bowen trans. 2d ed. 1946).

Early in its history Texas demonstrated a particularly zealous commitment to public enforcement of our social contract by adopting unique dual constitutional protections of the right to trial by jury. See TEX. CONST. art. I, § 15 and art. V, § 10; Texas Ass'n of Businesses v. Texas Air Control Bd., 852 S.W.2d 440, 460 (Tex.1993) (Doggett, J., concurring and dissenting). But with the jury's voice for the community unjustly squelched, the covenants of the public contract for the public good will no longer be enforced by the public.

---

5. See, e.g., C & H Nationwide, Inc. v. Thompson, —— S.W.2d ——, —— (Tex.1993) (Doggett, J., concurring and dissenting); General Motors Corp. v. Saenz, —— S.W.2d ——, —— (Tex.1993) (Doggett, J., dissenting); Texas Ass'n Businesses v. Texas Air Control Bd., 852 S.W.2d 440, 459–67 (Tex.1993) (Doggett, J., concurring and dissenting); Boyles v. Kerr, 855 S.W.2d 593, 609–10 (Tex.1993) (Doggett, J., dissenting); May v. United Services, 844 S.W.2d 666, 675 (Tex.1992) (Doggett, J., dissenting); Leleaux v. Hamshire-Fannett Indep. Sch. Dist., 835 S.W.2d 49, 55–56 (Tex.1992) (Doggett, J., dissenting); Crim Truck & Tractor v. Navistar Int'l. Transp. Corp., 823 S.W.2d 591, 599 (Tex.1992) (Mauzy, J., dissenting); Reagan v. Vaughn, 804 S.W.2d 463, 491 (Tex.1991) (Doggett, J., concurring and dissenting); Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting).