

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| TEXAS DEPARTMENT OF TRANSPORTATION, | § | No. 08-23-00148-CV |
| | § | Appeal from the |
| Appellant, | § | County Court at Law No. 3 |
| v. | § | of El Paso County, Texas |
| MICHAEL BAGG, | § | (TC# 2018-DCV-1231) |
| Appellee. | § | |

## MEMORANDUM OPINION

This case involves a bicycle accident that resulted in serious disabling injuries to Dr. Michael Bagg. The jury by its verdict no doubt believed that the accident was caused when Dr. Bagg's bicycle wheel got caught in the gap of an expansion joint in a bike lane. The gap, measuring over an inch wide and about three-quarters of an inch deep, caused Dr. Bagg to lose control and flip over on his bike. The defendant is the Texas Department of Transportation (TXDOT) who is protected by sovereign immunity. Accordingly, Dr. Bagg was required to meet one of the statutory waivers to sovereign immunity—here, that meant proving that TXDOT was grossly negligent with respect to the absence of filler material in the gap. The jury believed that he did. TXDOT's appeal claims that he did not. We are constrained to agree with TXDOT, but echo

the observation of former Supreme Court Justice Willett that "just as immunity is inherent to sovereignty, unfairness is inherent to immunity." *City of Galveston v. State*, 217 S.W.3d 466, 480 n.38 (Tex. 2007) (Willett, J., dissenting). We reverse and render judgment for TXDOT.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The accident

Redd Road and N. Desert Boulevard run perpendicular to one another. On October 2, 2016, Dr. Bagg was riding his bike west-bound in a bike lane on Redd Road, intending to turn right onto Desert Boulevard. As he approached the intersection, riding about five miles an hour, Dr. Bagg entered part of the bike lane referred to as a shared-use lane. This area is shared by vehicles and cyclists making right turns.

TXDOT had placed an expansion joint in the shared-use lane between slabs of concrete, creating a gap between the slabs. The joint is needed to minimize movement of the pavement. The joint was filled with a "backer rod" and then sealed with a rubberized sealant, which then dries into a "spongy rubber material." It is common, however, for the joint's filler to "wash out" over time due to weather, salting of the roads, and traffic. A photo depicts the road and shared-use lane as Dr. Bagg might have seen it as he prepared to turn right onto N. Desert Boulevard:

2



The bike lane here is unique because of the longitudinal joint, as other bike lanes are hike-and-bike trails topped with asphalt.

Dr. Bagg testified that he saw the expansion joint but could not see the indentation in the joint. As he leaned to the right to make the right turn, his front tire got caught in the expansion joint.[1] This in turn jerked his bike straight while Dr. Bagg was leaning to the right. He fell off his bike and suffered a complex fracture of his elbow and fracture of his femur. Both fractures required surgical intervention and lengthy rehabilitation. TXDOT does not dispute that just the medical bills

---

[1] Dr. Bagg was riding what is commonly referred to as a "road bike" which has narrow tires, usually inflated to a high psi. Riders often use pedals with clips so that their cycling shoe is locked onto the pedal. This style bicycle differs from mountain, hybrid, or commuter bikes that have larger width tires.

and lost wages from the accident equaled the statutory cap for damages that govern claims against TXDOT.[2]

The day after the accident, Dr. Bagg's wife took a picture of the gap. Six weeks after the accident, Dr. Bagg and his wife revisited the site and again saw that the expansion joint was missing filler. Dr. Bagg did not measure the gap but estimated that it was two inches deep and two inches wide. A later inspection using a ruler, showed the gap is a little over one inch wide and three-quarters of an inch deep. Dr. Bagg sued TXDOT, alleging claims of negligence and gross negligence for its failure to warn and repair the dangerous condition.

## B.   Prior notice of the gap

Much of the trial focused on whether TXDOT had notice of a problem with a lack of filler in the expansion joint that would create a hazard for cyclists. That testimony came in through four witnesses.

### (1)  Sergio Martinez

Sergio Martinez, another cyclist, testified that in 2014 he was riding his bike on Redd Road, also intending on turning right onto N. Desert Boulevard. His bike tire became stuck in the joint's gap. He fell off his bike, slid 15 feet across the ground, and cracked his helmet in the process. He lost consciousness for about 10 seconds. Afterward, he felt pain in his left shoulder, but he walked away with what someone else at the time described as "minimal injuries," consisting of scratches to his legs, hips and shoulders. Martinez was shown the picture of the joint that was taken after

---

[2] *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.023(a) ("Liability of the state government under this chapter is limited to money damages in a maximum amount of $250,000 for each person . . .[.]"). Dr. Bagg lost $180,000 in income and incurred at least $70,000 in medical expenses, which together meet the cap. The jury also found $800,000 in non-pecuniary damages.

Dr. Bagg's accident and agreed that the picture depicted, more or less, what the gap looked like in 2014.

After his accident, Martinez wrote a letter to TXDOT's district engineer, Robert Bielek, describing the accident, its location, his injuries, the gap in the expansion joint, and the need to repair the bike lane "before anyone else gets hurt." He testified the letter was mailed about three days after his accident to TXDOT at its correct address in El Paso, Texas. The envelope contained Martinez's name and return address. The letter was never returned to him as undeliverable. Martinez never received a response to his letter. TXDOT, however, contended at trial through its employee witnesses that it never received this letter, nor would TXDOT have simply ignored it.

**(2) Sandra Sierra**

Sandra Sierra served as the administrative assistant to District Engineer Robert Bielek between 2014 and 2016. As part of her duties, she responded to public information records requests. Dr. Bagg's attorney had served TXDOT with a public information request seeking any complaints, repairs, inspections, or any other kinds of documents related to the intersection of Redd Road and N. Desert Boulevard. Sierra searched TXDOT's records and found no responsive records to any of these requests. *Id.*

Sierra described TXDOT's protocols for receiving complaints. When TXDOT received letter complaints, they were received by the Business Services Department. That department would open the mail and stamp the letter with the date it was received. The letters were then placed in their appropriate box, designated to each division—the district engineer had his own box for letters. Between 2014 and 2016, Sierra received all letters directed to Robert Bielek, the district engineer. *Id.*

All complaints are entered into a tracking system. Sierra handled virtually all local complaints, which were then assigned to the correct division. When complaints were received by letter, they were scanned and entered in the tracking system. After Sierra assigned the complaint to the appropriate division, she would inform the complainant of the status of their complaint.

Sierra testified that she did not recall seeing Martinez's 2014 letter before this litigation, or any complaint letters whatsoever. She could not dispute that Martinez's letter was received, only that she did not recall seeing it. Had she seen it, Sierra would have informed the district engineer of the subject matter of the letter. She also testified that while it was uncommon for the district engineer to receive complaint letters, it was his habit to speak to the complainants directly.

**(3) Hector Granados**

Beginning in 2011, Hector Granados worked as the maintenance supervisor for TXDOT's westside office in El Paso. As part of his duties, he would address the public's complaints about roadway conditions. Some complaints were received directly by the westside office while most were first directed to TXDOT's district office, then assigned to the westside office. A complaint would then trigger an inspection of the area described in the complaint, which would inform TXDOT's next steps.

Granados testified that TXDOT would repair bike lanes, regardless of whether the issue was a city or state responsibility. And while Granados could not recall the exact date that he sent his crew chief to repair the joint on Redd Road, he agreed that sometime in 2018, the joint was repaired. But he did not remember ever receiving any other complaint about the bike lane. He also could not say for certain whether the bike lane was repaired at any other point before 2018. Granados also testified he never saw Martinez's letter in 2014.

6

Granados testified that there are no record-keeping systems in place to document repairs made on TXDOT roads. Instead, TXDOT's workers' time sheets, which are filled out daily by each employee, reflect the general area where repairs are made using references to "mile markers." But the time sheets do not document specific problems that were repaired. And there are no computer databases to allow the retrieval of specific information about repairs made in the bike lanes.

### (4) Chad Chairez

Chad Chairez worked as a TXDOT crew chief under Granados's authority between 2014 and 2016. By the time of trial, he had replaced Granados as the maintenance supervisor. He testified that the bike lane at issue is TXDOT's responsibility and that TXDOT employees routinely performed inspections there. But TXDOT employees have not received training in how to identify unsafe conditions in bike lanes.

The first time Chairez inspected the expansion joint was in 2018, when he searched the area for potholes. He did not know the joint's condition or that it posed a risk to cyclists before 2018. While TXDOT employees routinely inspected the area, Chairez was unaware of any TXDOT employee who noticed a problem with the joint before 2018. And he was also unaware of any records reflecting work done on the bike lane from 2014 to 2016.

Chairez was shown the picture of the expansion joint taken by Dr. Bagg shortly after his accident and agreed that as pictured it posed a hazard to cyclists. Chairez also agreed that the gap pictured in the joint existed long enough for grass to start growing out of the joint. When he repaired the joint in 2018, he measured the gap at about an inch wide and three-quarters of an inch deep. He also noticed there was patching material already in the gap, so he added filler to make it flush with the concrete. Chairez testified that "problem areas"—those with known hazards—are inspected once or twice a week, but otherwise, there are no routine, scheduled repairs.

7

## C. Trial proceedings below

The trial court submitted a four-question charge that asked the jury: (1) was TXDOT grossly negligent (as we explain below); (2) was Dr. Bagg negligent; (3) if question 1 and 2 were answered yes, then whose comparative fault caused the injuries; and (4) damages. The jury answered yes as to TXDOT's gross negligence, no to Dr. Bagg's ordinary negligence, it did not apportion fault, and the jury assessed substantial amounts for pecuniary and non-pecuniary damages.

After trial, TXDOT moved for judgment notwithstanding the verdict and a new trial. TXDOT argued that it was entitled to a take-nothing judgment because there is no proof that (1) the condition posed an unreasonable risk of harm, or (2) that TXDOT had actual, subjective knowledge of the condition. TXDOT also argued there was no waiver of sovereign immunity based on its design of the roadway, which included the longitudinal joint in the shared-use lane. TXDOT's motion for new trial incorporated the JNOV by reference and reiterated the same arguments made in the motion for JNOV. The trial court denied both motions and TXDOT perfected its appeal.

## II.  DISCUSSION

We begin with what the law requires Dr. Bagg to prove, then discuss what the jury was asked, what TXDOT challenges on appeal, how we must review the evidence, and last how we resolve the issues presented.

### A.  What Dr. Bagg was required to prove

The State and its agencies are generally immune from suit except as expressly allowed by the Texas legislature. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *State Dep't of Transp. v. Barraza*, 157 S.W.3d 922, 926 (Tex. App.—El Paso 2005,

no pet.) (stating TXDOT is immune from suit). Despite the perceived unfairness this doctrine may yield in some cases, the doctrine is justified by its policy of protecting "'the public from the costs and consequences of improvident actions of their governments,' . . . and ensures that the taxes the public pays are used 'for their intended purposes[.]'" *Hillman v. Nueces County*, 579 S.W.3d 354, 361 (Tex. 2019). Accordingly, when it applies, sovereign immunity deprives a trial court of subject matter jurisdiction. *Miranda*, 133 S.W.3d at 225.

The legislature has created a limited waiver of immunity for three categories of cases: (1) use of publicly owned automobiles, (2) premises defects, and (3) injuries arising out of the condition or use of tangible personal property or real property. Tex. Civ. Prac. & Rem. Code Ann. § 101.021; § 101.022(a). This case involves the second category. In a premise defect case, the governmental entity owes the claimant the same duty that a private landowner owes to a licensee. Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a). The duty owed to a licensee on private property requires that "a landowner not injure a licensee by willful, wanton or grossly negligent conduct, and that the owner use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware and the licensee is not." *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992).

The Act's waiver of immunity comes with other exceptions and limitations, two of which are implicated here: the recreational-use statute and the discretionary powers exception. *See Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 657, 659 (Tex. 2007) (describing recreational use and discretionary powers exceptions).

The recreational-use statute modifies the Act's scheme for waiving immunity by limiting the government's liability in cases where the plaintiff engages in recreation on the government's premises. "Recreation" is statutorily defined to include, among many other activities, bicycling,

9

and so it applies here. Tex. Civ. Prac. & Rem. Code Ann. § 75.001(3)(M). Under the statute, a person who enters government property and engages in recreation is owed no greater duty than that owed to a trespasser. *Id.* § 75.002(f). Thus, the statute limits the Act's waiver of immunity "by classifying recreational users as trespassers and requiring proof of gross negligence, malicious intent, or bad faith." *Suarez v. City of Texas City*, 465 S.W.3d 623, 627 (Tex. 2015).

"Gross negligence" is defined as "an act or omission involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of others." *State v. Shumake*, 199 S.W.3d 279, 287 (Tex. 2006). Gross negligence demands proof of objective and subjective components: (1) viewed objectively from the standpoint of the actor at the time of its occurrence, the act or omission involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11); *Suarez*, 465 S.W.3d at 633. Put differently, the landowner must be "subjectively aware of, and consciously indifferent to, an extreme risk of harm." *Shumake*, 199 S.W.3d at 288. ("what separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care") (citing *Louisiana–Pacific Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex. 1999)).

The discretionary powers exception also immunizes governmental entities from suit for their discretionary decisions. *Flynn*, 228 S.W.3d at 657 (describing discretionary powers exception).[3] Both parties here agree that the exception would preclude Dr. Bagg challenging the

---

[3] The Act's waiver of immunity does not apply to a governmental entity when:

10

decision to design the bike lane with an expansion joint.[4] *See City of El Paso Texas v. Torres*, 662 S.W.3d 607, 619 (Tex. App.—El Paso 2022, pet. denied) (road design is discretionary function). So instead, Dr. Bagg's theory of a premises defect is limited to the absence of the filler in the expansion joint.

The trial court's jury charge, which no party challenges, incorporated all these requirements into the first question:

> Was Texas Department of Transportation's gross negligence, if any, a proximate cause of the Occurrence in question?
>
> Texas Department of Transportation was grossly negligent with respect to the condition of the premises if—
>
> 1. the absence of filler in the joint between concrete sections of the roadway at the time and place of the Occurrence posed an unreasonable risk of harm, and
>
> 2. Texas Department of Transportation both failed to adequately warn Michael Bagg of the danger and failed to make that condition reasonably safe, and
>
> 3. Texas Department of Transportation's conduct was an act or omission—
>
>     a. which, when viewed objectively from the standpoint of Texas Department of Transportation at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
>     b. of which Texas Department of Transportation had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

The jury answered yes to this question.

---

> (1) the failure of a governmental unit to perform an act that the unit is not required by law to perform; or
>
> (2) a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit.

Tex. Civ. Prac. & Rem. Code Ann. § 101.056.

[4] The avenue for that kind of claim would require the plaintiff to allege and prove that the expansion joint is a special defect, which is not asserted or claimed here. *See City of Denton v. Paper*, 376 S.W.3d 762, 764 (Tex. 2012) (per curiam) (holding depression in roadway that cause bicyclist to crash was not a special defect).

11

### B.  TXDOT's challenge to the finding

On appeal, TXDOT raises three issues. It first challenges the legal sufficiency of the evidence to support the verdict. TXDOT next claims it did not breach the duty of care as explained in the charge. Finally, TXDOT argues that it retains its sovereign immunity for any discretionary acts that it performed. Clustered under these three headings, we discern that TXDOT claims that no evidence supports three of the essential components of the liability question, either because there is no evidence of the element, the evidence urged as a matter of law does not support the element, or the evidence relates to a discretionary function and cannot be considered by this Court. The end-result is that without the liability finding—which mirrors the exception to sovereign immunity under which Dr. Bagg is traveling—the trial court lacks subject matter jurisdiction. We further explain TXDOT's three challenges.

First, TXDOT claims that there is no evidence that the expansion joint's condition posed an "unreasonable risk of harm." Factually, it premises this argument on the existence of only one prior accident occurring two years before Dr. Bagg's, at an unknown place along the joint line, and which caused "minimal" injuries (TXDOT's word, not ours). Legally, TXDOT relies on the reasoning from the Texas Supreme Court decision in *United Supermarkets, LLC v. McIntire*, 646 S.W.3d 800 (2022) (per curiam). That case acknowledges that what is an unreasonably dangerous premises condition is ordinarily a fact question for the fact-finder. *Id.* at 802. But not always. The *McIntire* court held that a small divot in a parking lot (described as either a three-quarters of an inch divot or a six-inch wide, three-quarters of an inch deep depression) that caught the heel of a patron, causing her to trip, was not an unreasonably dangerous condition as a matter of law. *Id.* at 801 n.3. *McIntire* looked to five factors to decide that question. *Id.* at 803 ("whether the relevant condition was clearly marked, its size, whether it had previously caused injuries or generated

12

complaints, whether it substantially differed from conditions in the same class of objects, and whether it was naturally occurring."). TXDOT argues these factors dictate that the expansion joint here is equally not an unreasonably dangerous condition as a matter of law, removing it as a jury question.

Second, TXDOT contends that it had no actual knowledge of an extreme degree of risk which is one of the predicate elements for gross negligence. Its argument has several threads. One focuses on the absence of its knowledge of the gap at the time of Dr. Bagg's accident. TXDOT relies on a line of cases holding that knowledge that a premises condition might deteriorate over time is different from actual knowledge at the time of a plaintiff's injury. *See City of Denton v. Paper*, 376 S.W.3d 762, 764 (Tex. 2012) (per curiam) (holding that a city's knowledge that a repaired area in a street might sink again did not establish actual knowledge of a defect); *City of Dallas v. Thompson*, 210 S.W.3d 601, 603 (Tex. 2006) (per curiam) (holding that city's knowledge that a coverplate could become loose with ordinary wear and tear, and create a hazard, did not establish actual knowledge at the time of injury). Another thread of the argument urges that TXDOT never received the complaint letter from Sergio Martinez, or if it did, that was two years before Dr. Bagg's injury. Next, TXDOT argues that Martinez's accident—the only claimed prior notice of some alleged dangerous condition—was minor with no serious injuries.

Third, TXDOT contends that there is no evidence that it had subjective awareness of the joint's condition at the time of Dr. Bagg's accident and was indifferent to the problem.

Underlying each of these arguments, TXDOT argues that the discretionary decisions exception applies here to shield TXDOT from suit for its roadway design decisions and other operational practices.[5]

## C. Standard of review

Each of TXDOT's challenges contend that the evidence to support the jury's verdict is legally insufficient. Under a legal sufficiency or "no evidence" challenge, we will uphold a jury's finding if it is supported by "[a]nything more than a scintilla of evidence." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014), (quoting *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach the finding or judgment being challenged. *See Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (the test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."). On the other hand, if the evidence is so weak that it only creates a "mere surmise or suspicion" of the existence of a vital fact, "it is regarded as no evidence." *Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

In resolving a no-evidence challenge, we view the evidence in the light most favorable to the finding or judgment, and "indulge every reasonable inference that would support it[,]" crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a

---

[5] TXDOT argues that under the discretionary decisions exception, it retains sovereign immunity for its decisions to (1) place a joint in the bike lane, (2) not require training for maintaining bike lanes, and (3) for keeping certain records but not others. In essence, TXDOT recharacterizes Dr. Bagg's claims as being predicated on the alleged faulty design of the bike lane and TXDOT's operational practices. Yet, the jury charge would not have allowed the jury to find TXDOT grossly negligent for the design on the expansion joint or its record keeping practices—it limited the jury's consideration to the "absence of filler in the joint[.]" We discuss the maintenance theory in more detail below.

reasonable fact-finder could not. *City of Keller*, 168 S.W.3d at 822, 827. The trier of fact can draw from the evidence whatever reasonable inferences it wishes, even if more than one inference is possible. *Id.* at 821–22. Yet "[a]n inference is not reasonable if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion." *Suarez*, 465 S.W.3d at 634–35 (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) and *City of Keller*, 168 S.W.3d at 814).

Thus, we will sustain a legal sufficiency or "no evidence" challenge only if the record shows: "(a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact." *City of Keller,* 168 S.W.3d at 810, (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960)).

As outlined above, TXDOT raised three no-evidence challenges to three parts of Question One: (1) whether the absence of filler was an unreasonably dangerous condition; (2) whether TXDOT had actual knowledge of an extreme degree of risk, and (3) whether TXDOT had actual subjective knowledge of that risk and proceeded with conscious indifference. We need only address the last two points.

**D. The evidence fails to support TXDOT's knowledge of an extreme degree of risk**

Did TXDOT know of an "extreme degree of risk?" An extreme degree of risk is "a function of both the magnitude and the probability of the anticipated injury to the plaintiff." *Transp. Ins. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994), *superseded by statute on other grounds as stated in U-Haul Int'l, Inc., v. Waldrip*, 380 S.W.3d 118, 140 (Tex. 2012). This element is not met by evidence

15

of a "remote possibility of injury" or a "high probability of minor harm, but rather 'the likelihood of serious injury' to the plaintiff." *Id.* (citing *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993)). To determine whether an act or omission involves an extreme degree of risk, courts examine the "events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight." *Id.* at 23.

Additionally, courts must distinguish acts or omissions that might constitute ordinary negligence from those that meet the higher gross negligence standard. As the Texas Supreme Court has recognized, every case involving ordinary negligence or gross negligence also involves an alleged injury. *Id.* But "the magnitude of the injury may be entirely disproportionate to the riskiness of the behavior," such that even in cases where grave injury has resulted, the behavior that caused it may not be considered gravely injurious. *Id.* The question here is whether the failure to warn of or repair a gap in an expansion joint, measuring "a little over an inch wide" and "about three-quarters of an inch deep," involved an extreme risk of harm as viewed objectively from TXDOT's standpoint at the time of Dr. Bagg's accident, without the benefit of hindsight. *See id.* (stating the standard). And more particularly, did TXDOT recognize that risk at the time of Dr. Bagg's crash.

Dr. Bagg argues that he proved the extreme-degree-of-risk element through evidence of Martinez's accident in 2014.[6] And because TXDOT had no records to show it filled the gap between 2014 and 2016, he argues that TXDOT effectively would have known of the same defect, and its risk, in 2016. While there is no single test for determining actual knowledge of a condition, courts generally consider whether the premises owner received reports of prior injuries or reports

---

[6] While TXDOT disputed that it ever received that letter, we must assume given our standard of review that the jury resolved the conflicting evidence in Dr. Bagg's favor. The relevant question, however, is whether that letter imputed to TXDOT knowledge of an extreme degree of risk in the unfilled joint.

16

of the potential danger posed by the condition. *Univ. of Texas-Pan Am. v. Aguilar*, 251 S.W.3d 511, 513 (Tex. 2008).

Martinez's letter to TXDOT in 2014 describes a 12-foot-long section of the expansion joint that was about 1.5 inches wide, and 2 inches deep. He explained that it caused him to lose control of his road bike and slide 15 feet into a curb. The force of impact cracked his helmet. He lost consciousness for some ten seconds based on a witness's estimate. He was offered an ambulance but declined because he self-assessed his injuries as "mostly a few scratches and bruises to [his] legs, hips and shoulders[.]" He walked to a nearby bike shop and was told by someone he was "fortunate to walk away with minimal injuries[.]" He urged TXDOT to repair the pavement because it is dangerous and needs to be immediately addressed.

Martinez's accident transpired in the same way as Dr. Bagg's, but resulted in what an unnamed person at the time described as "minimal injuries." We could agree that an experienced cyclist might view Martinez's letter as describing something beyond minimal. An experienced cyclist might appreciate the force leading to a 15-foot skid. And someone knowledgeable about head injury might well appreciate the significance of any degree of loss of consciousness. But our record is lacking any evidence that TXDOT, (or whatever employee may have received Martinez's letter) shares that kind of insight to see beyond the description of a single accident resulting in what one person described as minimal injuries. That is, the letter communicated a risk, but not the extreme degree of risk that Texas requires for gross negligence.

Aside from the text of the letter, it was also the only prior complaint. *See Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993) (finding no evidence of gross negligence when store manager declined to fix a three-quarters of an inch "ridge" at base of concrete ramp, even though a sales manager had stumbled on the ridge and informed management that it was a safety

17

hazard). Nor was there evidence of how often this part of the bike path is traveled, to place this single accident in context. Viewed objectively without the benefit of hindsight, the risk of failing to fill in a gap measuring just under an inch deep and one inch wide would not signal to TXDOT the extreme degree of risk leading to the kind of injuries sustained by Dr. Bagg.

Martinez's complaint letter also must be viewed against the context of the recreational activity he engaged in. In *Suarez*, the Texas Supreme Court recognized that there is no duty to warn or protect against artificial conditions that produce risks of harm inherent in the recreational activity that can be reasonably anticipated. 465 S.W.3d at 633. Generally, cyclists should expect to encounter surface irregularities in their biking paths, and these kinds of risks are not normally "beyond the ken of a reasonable [cyclist]." *See id.* at 634 (stating the same of swimmers at the beach); *see also McIntire*, 646 S.W.3d at 803 (stating that invitees are expected to use ordinary care when navigating parking lots because surface irregularities are "ubiquitous").

Dr. Bagg also points us to testimony that TXDOT created the expansion joint and knows that the joint filler commonly deteriorates with traffic, weather, and normal salting of the roads as proof of its subjective knowledge of extreme degree of risk. Chad Chairez testified that TXDOT laid the bike lane with concrete, created the joint between concrete panels, and then filled it with a spongy rubber material. Additionally, Chairez admitted that the filler material commonly erodes due to weather, salting of the roads, and traffic. Based on these admissions, Dr. Bagg argues that TXDOT cannot deny knowledge of the joint's condition because it created the condition. *See Loy v. City of Alice*, No. 04-18-00969-CV, 2019 WL 3642656, at *2 (Tex. App.—San Antonio Aug. 7, 2019, no pet.) (stating "[t]he government can . . . be liable by creating a condition that a recreational user would not reasonably expect to encounter on the property in the course of permitted use") (internal quotations omitted).

18

Yet Chairez's testimony is legally insufficient to prove actual knowledge of the condition at the time of the accident. TXDOT unequivocally did not create the condition in this case. The jury was instructed that "condition" meant "the absence of filler in the joint between concrete sections of the roadway at the time and location of the [o]ccurrence." TXDOT, however, created the joint with the filler already installed. *See Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407 (Tex. 2006) (distinguishing the circumstances that can give rise to a dangerous condition from the dangerous condition itself). The fact that TXDOT knew that the filler would deteriorate over time because of weather, traffic, or salt on the roads does not mean that TXDOT knew the filler was missing at the time of Dr. Bagg's incident. Courts have consistently held that knowledge of a potential problem is not actual knowledge of an existing dangerous condition. *Reyes v. City of Laredo*, 335 S.W.3d 605, 609 (Tex. 2010) (per curiam). And knowledge that materials deteriorate over time and eventually cause a dangerous condition does not amount to knowledge of the dangerous condition at the time of the accident. *Thompson*, 210 S.W.3d at 603. Thus, evidence that TXDOT knew that the joint would eventually need repairing—even on a common basis—is legally insufficient to satisfy the actual-knowledge element.

Finally, Dr. Bagg emphasizes that TXDOT employees regularly inspect the roadway but lack the proper training to recognize biking hazards. Gross negligence requires that the actor appreciate the peril, but his actions demonstrate that he did not care. *Louisiana–Pacific Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex. 1999). Consequently, gross negligence never results from "momentary thoughtlessness, inadvertence, or error of judgment." *Alexander*, 868 S.W.2d at 326. There is nothing in the record to show that the decision on how to train employees about bike hazards (even if actionable) was itself grossly negligent. And the product of any lack of training

19

only means that a TXDOT crew member who inspected the expansion joint may not have recognized it as a hazard at all to a cyclist.

In sum, Dr. Bagg did not present legally sufficient evidence, viewed objectively, that showed TXDOT was aware of an extreme degree of risk considering the probability and magnitude of the potential harm to others.

### E. No evidence of actual subjective awareness and conscious indifference

Moreover, there is no evidence that even if TXDOT received the letter, and appreciated the potential for some serious injury, that it was consciously indifferent to rights, safety, or welfare of others. Sandra Sierra described the procedures for receiving mailed complaints, which entailed opening and stamping the mail; scanning written complaints; entering them into a tracking system; and then routing the mail to its intended destination, such as the appropriate area maintenance office. She stated that if she had seen a letter complaint, she would have informed Bielek of the complaint herself. The complaint was not, however, registered in TXDOT's complaint system. And testimony from the employees to whom the complaint would have been routed for correction knew nothing about it.

Dr. Bagg argues this state of the record raises an inference that someone at TXDOT received the letter and consciously ignored it. While that is one inference, there are others. For any number of reasons (some even from simple negligence), the letter may have fallen between the cracks of the system that TXDOT has constructed to handle road complaints. "An inference is not reasonable if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion." *Suarez*, 465 S.W.3d at 634–35. "An inference is not reasonable, however, if it is premised on mere suspicion—'some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.'" *Id.* (quoting

20

*Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727–28 (Tex. 2003)). This record simply lacks the kind of evidence which would allow the jury to reach the inference that Dr. Bagg urges—that the Martinez complaint was ignored out of conscious disregard for other cyclists—is a reasonable inference.[7] There is no evidence that TXDOT is hostile to cyclists or has a pattern or practice of ignoring public complaints. Just the opposite, the record shows it has a system for inspecting and fixing defects. When the gap was filled in 2018, it showed evidence of having been patched before at a date unknown.

We sustain Appellant's first issue.

## III.  DISCRETIONARY POWERS EXCEPTION

TXDOT argues that under the discretionary powers exception, it retains sovereign immunity for its decisions to (1) place a joint in the bike lane, (2) not require training for maintaining bike lanes, and (3) keep certain records but not others. In essence, TXDOT recharacterizes Dr. Bagg's claims as being predicated on the alleged faulty design of the bike lane and TXDOT's operational practices.

While discretionary decisions of governmental entities are protected under the Act, the exception is not controlling here. The jury charge would not have allowed the jury to find TXDOT grossly negligent for the design on the expansion joint—it limited the jury's consideration to the "absence of filler in the joint[.]" The crux of Dr. Bagg's argument was not that there was a joint in the bike lane—a discretionary design issue—but that the joint was missing filler, contrary to its

---

[7] Dr. Bagg's closing argument acknowledged the uncertainty of what happened to the letter when received: "So more probably than not, this letter made it to TxDOT. And, from there, none of us will ever know what somebody did with it. But just the fact that this letter makes it to TxDOT is the actual awareness."

original design.[8] And this absence of filler was a maintenance issue which is not a discretionary issue. Nonetheless, because we find that Dr. Bagg failed to prove actual knowledge of the joint's condition, as explained above, we hold sovereign immunity was not waived.

## IV. CONCLUSION

Because Dr. Bagg failed to prove TXDOT was grossly negligent, we hold the trial court lacked subject matter jurisdiction, and we reverse and render in favor of TXDOT.

JEFF ALLEY, Chief Justice

October 21, 2024

Before Alley, C.J., Palafox, and Soto, JJ.

---

[8] In fact, Dr. Bagg's counsel argued in closing arguments that they were not disputing the necessity of expansion joints: "What we're saying is they need filler if you're going to have that, especially in the bike lane."